**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SDE LOGISTICS, INC.,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:03-cv-1840-Orl-19KRS**

**AMCOR PET PACKAGING USA, INC.,**

**Defendant.**
_____

# ORDER

This case comes before the Court on the following:

1.     Defendant's Motion for Final Summary Judgment and Supporting Memorandum (Doc. No. 26, filed Dec. 23, 2004); Plaintiff's Response to Defendant's Motion (Doc. No. 40, filed Jan. 11, 2005).

2.     Plaintiff's Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof (Doc. No. 31, filed Jan. 3, 2005); Defendant's Response to Plaintiff's Motion (Doc. No. 41, filed Jan. 19, 2005).

**Background**

Defendant Amcor Pet Packaging USA, Inc. is a Delaware corporation doing business in Orlando, Florida, manufacturing empty plastic containers and not-yet-molded plastic bottles ("preforms") used by beverage manufacturers.  (Doc. No. 55, filed Mar. 22, 2005, p. 20).  Before shipping completed containers and preforms to its customers, Defendant often stores pallets of its products at offsite storage facilities, including public warehouses and one warehouse leased and operated by Defendant itself.  (*Id.* at 20, 21).

Plaintiff SDE Logistics, Inc. is a Florida corporation doing business in Orlando, Florida, formed by its principal, Edward Sanchez.  (*Id.* at 20).  Employed by a third party between 1999

and 2001, Sanchez worked as a truck driver shuttling pallets of Defendant's products from

Defendant's plant to its offsite storage facilities.[1]  (*Id.*).  In late 2001, Sanchez formed his own

company, Sanchez D. Express, Inc., through which he provided the same shuttling services to

Defendant.  (*Id.*).

Having learned that Defendant would need additional storage space, Sanchez, who had

never operated such a facility, in mid-2002 began looking into the possibility of leasing a

warehouse in order to provide storage services to Defendant.  (*Id.* at 21).  Sanchez approached

Mark Ariazi, Defendant's warehouse supervisor, and asked whether Ariazi would give him the

opportunity to serve Defendant's storage needs.  (*Id.*).  Ariazi testified that Sanchez had done

good work for Defendant through his trucking business, that he had been a problem-solver, and

that this performance motivated Ariazi to give Sanchez the opportunity to provide warehousing

services.  (Doc. No. 27, filed Dec. 23, 2004, Ariazi Depo., pp. 93, 116).

During this time Defendant wanted to have 24-hour access to its products; however, such

access was available only through its own warehouse, not the public facilities with which it was

then doing business.  (Doc. No. 27, Diaz Aff., ¶ 5).  Defendant's staff, including Ariazi and his

supervisor, Materials Manager Mike Frost, were discussing the idea of consolidating the storage

of all products in one public warehouse with 24-hour access.  (Doc. No. 27, Ariazi Depo., pp.

97–98).  Ariazi further testified that he told Sanchez that it "was probably our plan, to put

everything into [his] warehouse," but he stated that he never committed to using Sanchez's

---

[1] During the early portion of the period material to the instant case, Sanchez was doing
business with Schmalbach-Lubeca, Amcor's predecessor.  (Doc. No. 32, filed Jan. 3, 2005, Frost
Depo., p. 29).  For purposes of this Order, the Court will refer only to "Defendant" or "Amcor."

warehouse exclusively and did not intend to preclude Defendant from negotiating a better deal with another facility.  (*Id.* at 138, 39).  Frost testified that Ariazi did not have authority to negotiate warehousing contracts; however, he admitted that on at least a few occasions, Ariazi was asked to sign negotiated agreements in his absence.  (Doc. No. 32, Frost Depo., pp. 28, 34–35).

Sanchez testified that he began investigating the feasibility of leasing a warehouse based on Ariazi's "promise" that if Sanchez could find an appropriate facility, he would receive all of Defendant's products in Central Florida which were to be sent out for temporary storage.  (Doc. No. 27, Sanchez Depo., p. 117).  In July 2002, Sanchez met twice with Ariazi and Frost and shared with them information and brochures concerning two separate warehouse facilities for lease that he was considering.  (*Id.* at 100, 137).  According to Ariazi, both he and Frost were aware that Sanchez had no previous warehousing experience.  (Doc. No. 27, Ariazi Depo., p. 93–94).  Ariazi stated that he was Sanchez's primary contact but that he kept Frost informed of his continued talks with Sanchez regarding warehousing possibilities.  (*Id.* at 136).

*The September 12 Letter*

At the request of Sanchez, Ariazi agreed to sign a letter dated September 12, 2002, which was drafted by Sanchez for the purpose of demonstrating to a potential landlord that he had a customer lined up for his warehouse operations.  (Doc. No. 55, p. 21; Doc. No. 27, Sanchez Depo., p. 111).  The letter read as follows:

> This letter is to provide you with the estimates for the warehousing of the goods at SANCHEZ D. EXPRESS at CROSSROADS VI, 550 GILLS DRIVE, Orlando, FL 32824.
>
> We will be serving an estimated 10,000 up to 20,000 pallets per month at a rate of $8.5 commencing at [N]ovember 1, 2002.

Please [sign] the space below to ackno[w]ledge the initial agreement between our companies for the estimated amount of business detailed above.  This l[e]tter is to serve as an initial intent of business between AMCOR PET PACK[A]GING and SANCHEZ D. EXPRESS INC. to be presented to CORPOREX.  COR POREX [sic] is the representing entity for the lease of the warehouse space.

We are looking forward to servicing you in our 216,478 square feet warehouse and providi[n]g you an excellent service for your distr[ib]ution business.

(Doc. No. 26, Ex. 2).  Despite the letter's designation of a specific address and landlord, Sanchez and Ariazi both testified that they intended for the letter to be presented to any prospective warehouse lessor.  (Doc. No. 27, Ariazi Depo., pp. 95–96; Sanchez Depo., p. 120).

With regard to the stated quantity of 10,000 to 20,000 pallets, Sanchez stated that Ariazi provided him with that estimate so that a landlord would understand how much business Sanchez would have, but Sanchez testified that to him the number represented "all" of Defendant's products.  (Doc. No. 27, Sanchez Depo., pp. 107–08).  Ariazi stated that the letter was "to let Sanchez know how many pallets that we would be making and how much warehouse space he was going to get," but that he did not intend to bind Defendant to a minimum guarantee by signing the letter.  (Doc. No. 27, Ariazi Depo., p. 27).  He further stated that he expected that a more formal contract would be subsequently prepared setting forth the parties' obligations.  (*Id.* at 27, 32).

Sanchez testified that the letter was "like a portion of a subsequent contract that was going to be part of this" and that he was "later...supposed to come up with a draft contract to provide" to Defendant.  (Doc. No. 27, Sanchez Depo., pp. 114–15, 117).  Sanchez also characterized the agreement described in the letter as "not yet definitive" and meant that they were "preparing to do something."  (*Id.* at 111–12).  He further stated that at the time he and

Ariazi signed the September 12 letter, he was not sure that he would be able to acquire a warehouse.  (Doc. No. 76, filed Apr. 18, 2005, Sanchez Depo., p. 182).

***Drafting the Storage Agreement***

Sometime in October 2002, Sanchez asked Ariazi what type of procedure Defendant would follow in drafting a warehousing contract, and Ariazi provided to Sanchez a sample contract which had been drafted by National Distribution Center, another public warehouse facility in which Defendant stored its products.  (Doc. No. 27, Sanchez Depo., pp. 121–22).  Sanchez took the sample agreement to his attorney, Milton Figueroa, who made changes to and retyped the document.  (*Id.* at 124, 127).  Sanchez testified that by giving him the NDC sample, Defendant was not mandating the terms or form of the contract but that it was "providing me with information...so I can draw a decent contract to close the original promise made by Mark Ariazi of all goods and consequently followed by [the September 12] letter, report and estimate to describe by all means, and finally close it with a contract."  (*Id.* at 125).  Sanchez stated that he informed Figueroa that he had been promised all of the goods that Defendant was to publicly store.  (*Id.* at 127).

On October 31, 2002, Ariazi's employment with Defendant was terminated for reasons unrelated to the instant litigation.  (*Id.* at 135, 137; Doc. No. 27, Frost Aff., ¶ 5).  Until that time, Ariazi had been Sanchez's main contact with regard to his provision of future warehousing services to Defendant.  (Doc. No. 27, Sanchez Depo., p. 137).  After Ariazi's termination, Defendant's Plant Controller, Terry Diaz, instructed Sanchez to deal with Diaz and Frost concerning Defendant's warehousing arrangements.  (*Id.* at 138, 140).  At the end of November 2002, Sanchez provided to Diaz and Frost a draft storage agreement.  (*Id.* at 133).  Sanchez had

not previously discussed the terms and conditions of the proposed agreement with Diaz or Frost and did not do so at that time.  (*Id.* at 140; Doc. No. 55, p. 21).  Diaz informed Sanchez that the draft agreement would be reviewed by representatives located in Defendant's corporate offices.  (Doc. No. 55, p. 21).  Sanchez testified that he made no mention of the September 12, 2002, letter at this meeting and that to his knowledge Diaz and Frost were never provided with a copy of the September 12 letter.  (Doc. No. 27, Sanchez Depo., p. 140).  According to Diaz, the draft provided by Sanchez included no minimum storage requirement and made no reference to the September 12 letter.  (Doc. No. 27, Diaz Aff., ¶ 7).

Also in November 2002, Sanchez incorporated SDE Logistics, Inc., Plaintiff, through which to conduct his warehousing business.  (Doc. No. 76, Sanchez Depo., pp. 164–65).  Plaintiff entered into a lease agreement for a warehouse facility located at 7575 Chancellor Drive in Orlando on January 24, 2003.  (Doc. No. 55, p. 21; Doc. No. 26, Ex. 1, pp. 1, 2).  Both the location of the facility and the landlord with whom Plaintiff entered the lease agreement were different from those identified in the September 12 letter signed by Ariazi.  None of Defendant's representatives were involved in Plaintiff's lease negotiations with its landlord, and Defendant was not asked to be guarantor of the obligations under the lease.  (Doc. No. 55, p. 21).

At the time that Plaintiff executed the lease, Sanchez had neither received revisions nor had further negotiations with Diaz or Frost regarding the terms and conditions of the draft storage agreement he had given to them in November of 2002.  (Doc. No. 76, Sanchez Depo., p. 151).  However, Sanchez testified that as of January 24, 2003, Diaz and Frost had repeated statements that Plaintiff would receive "all goods from their plant and that not to worry, that they will sign the contract."  (*Id.* at 152).  He further stated that he informed Diaz that Plaintiff was

preparing to enter into a lease agreement for a warehouse.  (*Id.* at 155).  When asked why he did

not wait to sign the lease until he had an executed agreement for warehousing services with

Defendant, Sanchez replied, "Their word was enough.  I had no doubts that whatever they told

me was going to be bounded."  (*Id.* at 156).

Plaintiff began hiring between eighteen (18) to twenty-five (25) full-time employees to

staff the warehouse immediately upon executing the lease, and the warehouse began accepting

empty pallets and dunnage from Defendant on February 7, 2003, before executing a formal

storage agreement.  (*Id.* at 162, 166).  Around this time, Frost inspected Plaintiff's warehouse to

ensure that it was satisfactory for the storage of Defendant's products.  (Doc. No. 55, p. 22; Doc.

No. 32, Frost Depo., p. 75).

### Executing the Storage Agreement

At a meeting on February 11, 2003, Diaz and Frost provided Sanchez with comments and

proposed revisions which were handwritten on the draft storage agreement.[2]  (Doc. No. 55, p. 22;

Doc. No. 76, Sanchez Depo., pp. 145–48).  This was the first time Sanchez had discussed the

draft with Diaz and Frost since November 2002.  (*Id.* at 145).  According to Sanchez, Diaz and

Frost informed him during the course of this meeting that "they couldn't put a minimum [volume

into the contract] because they will exceed the amount of pallets to be put in my warehouse.

And if they do, they're bounded to going to corporate and asking for authorization....  I had no

---

[2]  During his deposition, Sanchez appears to have been questioned about the version of
the draft agreement which included the handwritten comments of Diaz, designated as Exhibit 18,
and Sanchez was asked to compare that version to the final agreement as executed.  (Doc. No.
76, Sanchez Depo., 145).  However, no such exhibit was submitted with Sanchez's deposition
transcript to the Court.

problem because all goods were coming into my warehouse...." (*Id.* at 161). However, Diaz and Frost averred that they "advised Mr. Sanchez that he was taking a huge risk in undertaking a warehouse operation because Amcor was not committing to any minimum storage requirement." (Doc. No. 27, Diaz Aff., ¶ 8; Frost Aff., ¶ 8). According to Diaz and Frost, Sanchez replied that he wanted to proceed with the Storage Agreement because he was a "risk taker." (Doc. No. 27, Diaz Aff., ¶ 8; Frost Aff., ¶ 8). Sanchez denies that Diaz and Frost ever told him that he was taking a risk. (Doc. No. 76, Sanchez Depo., p. 158).

Sanchez testified that Diaz and Frost suggested an amendment providing for a half-month rate for goods deposited for storage after the middle of the month, but that such change was not included in the final contract and that they "ha[d] no problem with it." (*Id.* at 147). Other revisions suggested by Defendant's representatives were taken by Sanchez to his attorney, Figueroa, who incorporated the changes and prepared a final draft for execution. (*Id.* at 150; Doc. No. 55, p. 22). Sanchez testified that the September 12, 2002, letter was never mentioned by anyone involved in the February 11, 2003, meeting, and he offered no explanation for why the letter was not referenced in the draft agreement. (Doc. No. 76, Sanchez Depo., p. 150).

On February 12, 2003, the parties executed a Storage Agreement for a term of three (3) years with a five (5) year renewal option on the part of either party. (Doc. No. 55, p. 22; Doc. No. 26, Ex. 1). The seven-page, single-spaced contract contained twelve (12) parts, each containing multiple subparts, and a preamble. (Doc. No. 26, Ex. 1). The document began with the following statement:

> WHEREAS. Depositor has certain goods which need to be warehoused and Warehouseman is in the business of warehousing similar types of goods. Depositor has provided Warehouseman with all material information regarding the specifications of such goods including information regarding the care and handling of said goods.

(*Id.* at 1).  Additionally, the agreement provided,

> II.  SHIPPING
> The Merchandise shall be consigned to Depositor in care of Warehouseman at the following address[:] 7575 Chancellor Dr. Orlando, [F]L 32809...
> ...
> II. [sic]  TENDER FOR STORAGE
> ...
> (b) All goods for storage shall be delivered at the warehouse properly marked and packaged for handling....

(*Id.* at 2).  The contract set forth a rate schedule by which Defendant agreed to pay $4.75 per pallet for monthly storage and minimum charge and $3.50 for handling (in and out) of pallets of plastic bottles, and $3.50 for monthly storage and $2.00 for handling (in and out) of pallets of preforms.[3]  (*Id.* at 2–3).  These rates were to be subject to an automatic annual increase of three percent (3%) at Plaintiff's discretion, and Defendant was to be charged for a full month's storage fee, regardless of when during the calendar month goods were received at the warehouse for storage.  (*Id.* at 3).  Plaintiff's facility was to operate 24 hours a day, seven days a week.  (*Id.* at 4).  Finally, the agreement provided that "[t]he warehouseman may, upon written notice to the Depositor..., require the removal of any goods by the end of the next succeeding month."  (*Id.* at 3).

The Storage Agreement contained no language concerning the number of products that Defendant was to store in Plaintiff's warehouse, nor did the contract state that Defendant would store its products exclusively in Plaintiff's facility.  Furthermore, the document was silent as to whether Plaintiff could store goods for other customers in addition to Defendant.  Finally, the

---

[3] Frost testified that the rates in the final Storage Agreement were identical to those quoted in Sanchez's November draft and that he and Diaz did not believe it was necessary to adjust those prices.  (Doc. No. 32, Frost Depo., pp. 65–66).

agreement made no mention of the September 12, 2002, letter.  However, Sanchez testified that

he continued to believe that he would receive all of Defendant's products sent for public storage

based on representations made to him on several occasions before February 12, 2003, by Diaz

and Frost that they planned to shut down Defendant's operations at other public warehouses and

to make Plaintiff's facility Defendant's "Central Florida distribution center."  (Doc. No. 76,

Sanchez Depo., pp. 158–59, 209–10, 212).  He stated that Plaintiff "could not have, and would

not have, entered into the Storage Agreement without the[se] assurances."  (Doc. No. 32,

Sanchez Aff., ¶ 4).  Diaz denied ever hearing anyone tell Sanchez or having told Sanchez

himself that Plaintiff's warehouse would be Defendant's distribution center for Central Florida.

(Doc. No. 34, filed Jan. 3, 2005, Diaz Depo., pp. 62–63).

     Diaz stated that Defendant entered into the Storage Agreement with Plaintiff because it

allowed Defendant 24-hour access to its products, the prices offered were competitively lower,

and it offered a commitment of lower price increases over a longer period of time than other

facilities.  (Doc. No. 27, Diaz Aff., ¶ 9).  When asked during his deposition for his understanding

of "[t]he merchandise" under the "SHIPPING" section of the contract,  Diaz testified that he

understood the term to refer to "our bottles and preforms...all of them."  (Doc. No. 33, Diaz

Depo., p. 21–22).  Diaz also characterized the agreement as being on a "per-pallet...pay-as-you-

go basis" and stated that the parties did not discuss or negotiate the use of the terms "the

merchandise," "all goods," or "depositor's goods."  (*Id.* at 9, 25–29).

     For the first month after the execution of the Storage Agreement, Sanchez testified that

business went well.  (Doc. No. 27, Sanchez Depo., p. 170).  Frost testified that in and around

March 2003, Defendant was in fact in the process of moving its products out of other public

warehouses and consolidating its public storage in Plaintiff's warehouse and that Plaintiff was

meeting expectations.  (Doc. No. 32, Frost Depo., pp. 13, 58, 79).  Diaz corroborated this

consolidation plan, stating that Defendant "moved its remaining product from its other public

warehouses to SDE's facilities" and "that was kind of our game plan, to gradually get out of

NDC and Total Logistics and put the product into the Sanchez warehouse."  (Doc. No. 27, Diaz

Aff., ¶ 10; Doc. No. 34, Diaz Depo., p. 75).

By mid-May 2003, however, Sanchez testified that Defendant was "trying to take all

goods away from the warehouse....[I]t was told by AMCOR employees that whoever sends a

truckload to SDE was going to get fired....Mr. Eric Peterson [warehouse supervisor] was

utilizing my trucks for storage to avoid sending the bottles to my facility."[4]  (Doc. No. 27,

Sanchez Depo., p. 214).  Around the same time, Sanchez was called to a meeting with Diaz,

Frost, and Defendant's Plant Manager, Sam Schember, at which Sanchez was asked to provide a

retroactive credit for the storage of pallets which had been stored in Plaintiff's warehouse for

less than half of a month.  (*Id.* at 214–16).  Despite the terms of the Storage Agreement, Plaintiff

consented and issued a credit of $37,816 on May 15, 2003, because according to Sanchez, "by us

giving this credit to them, they might consider not breaching the contract."  (*Id.* at 214, Ex. N).

Approximately a week and a half after issuing the credit, Sanchez received a letter from

Frost containing rate quotes provided to Defendant by another warehousing company, which

rates were lower than those agreed to in the Storage Agreement.  (*Id.* at 248–49).  Diaz averred

---

[4] Sanchez also testified that during this period, his company had additional problems
with Peterson and other of Defendant's employees, including harassment, racially discriminatory
remarks, intimidation, accusations of damaged and tainted goods, and veiled requests for
kickbacks.  (Doc. No. 27, Sanchez Depo., pp. 218–26, 245–48).

that sometime in March 2003, Defendant received an offer of 24-hour access and lower rates the NDC facility with which Defendant had conducted business in the past. (Doc. No. 27, Diaz Aff., ¶ 11). He stated that Plaintiff was given the opportunity to match the offered terms but did not respond to this opportunity. (*Id.*). Sanchez testified that Frost informed him that he wanted Plaintiff to match the price contained in the quote and that Defendant wanted a new contract. (Doc. No. 27, Sanchez Depo., pp. 249–50). According to Sanchez, Frost promised to provide revised projections concerning Defendant's increased production which would allow Plaintiff to lower its prices; however, Sanchez testified that he never received such information and therefore never provided Frost with a new proposal. (*Id.* at 250).

Diaz stated that between February 12, 2003, and May 15, 2003, Defendant stored at least 10,000 pallets in Plaintiff's facility per month. (Doc. No. 27, Diaz Aff., ¶ 15). Sanchez testified that by early June, Defendant was not sending any bottles[5] to Plaintiff's warehouse. (Doc. No. 27, Sanchez Depo., p. 226). Sanchez requested to meet with Defendant's representatives, and such meeting was held on June 4, 2003, with Sanchez, Diaz, Frost and Schember present. (Doc. No. 55, p. 22). Sanchez stated that he was asked by Schember if he had brought a proposal to the meeting, which he had not. (Doc. No. 27, Sanchez Depo., p. 227). He further testified that after an initial denial, Frost admitted that days earlier Defendant had already begun sending goods to another public warehouse for storage as well as using another trucking company for shuttling services. (*Id.*). According to Sanchez, Frost stated that Defendant would not send bottles to Plaintiff's facility any longer, but Sanchez was told that Defendant would still like to

---

[5] It is unclear from the record whether Sanchez is stating that Defendant sent none of its products to the facility or that it sent none of the higher-paying pallets of completed bottles.

use his services.  (*Id.* at 227, 239).  Unclear whether this statement referred to Plaintiff's

warehousing services or the shuttle services of Sanchez D. Express, Sanchez did not ask for

clarification because he "was not interested in bargaining for a lost cause" after what he

perceived to be Defendant's breach of the Storage Agreement.  (*Id.* at 239).

According to Diaz and Frost, Sanchez demanded at the June 4 meeting that Defendant

commit to minimum storage quantities and, for the first time, presented them with a copy of the

September 12, 2002, letter signed by Ariazi.  (Doc. No. 27, Diaz Aff., ¶ 12; Frost Aff., ¶ 10).

They averred that they informed Sanchez that they had no such authority and had never provided

such a commitment to another public warehouse.  (Doc. No. 27, Diaz Aff., ¶ 12; Frost Aff., ¶

10).  Finally, they gave Sanchez another opportunity to match the lower quote they had received

from his competitor, but he declined.  (Doc. No. 27, Diaz Aff., ¶ 12; Frost Aff., ¶ 10).  Diaz also

testified that when told by Sanchez that Plaintiff could not afford the warehouse without a

minimum quantity of Defendant's products, Diaz advised him that he was free to seek other

customers for his facility.  (Doc. No. 33, Diaz Depo., p. 18).

Upon returning to his office after the June 4 meeting, Sanchez informed Diaz by

telephone that Defendant had until the evening of June 6, 2003, to remove all of its goods from

Plaintiff's facility.  (Doc. No. 27, Sanchez Depo., p. 233).  Defendant complied with this

request.[6]  (*Id.* at 230; Diaz Aff., ¶ 13).

---

[6]  The removal of Defendant's goods was not a smooth operation.  According to Sanchez,
there were two calls to the Orange County Sheriff's Office on June 6, one placed by Defendant's
employees and one placed by Sanchez himself, resulting in the issuance of a trespass warning to
Defendant's employees.  (Doc. No. 27, Sanchez Depo., pp. 228–30, Ex. P).  Finally, Sanchez
allowed only Diaz to enter the warehouse for the removal of the goods.  (*Id.* at 230).

Frost testified that Defendant makes its warehousing decisions based on cost and negotiated prices. (Doc. No. 32, Frost Depo., p. 83). He stated that after Defendant elected to store goods with NDC in June 2003, pursuant to the quoted rates provided in March 2003 which were lower than Plaintiff's prices, it did so for only six (6) months before moving its products once more. (*Id.*). Frost further testified that none of Defendant's similar storage agreements with other public warehouses have contained quantity requirements and that despite the frequency of Defendant's decisions to cease and restart its dealings with such facilities, it has never been charged a termination fee or been subject to other liability. (*Id.* at 93–94).

Plaintiff initiated the instant lawsuit against Defendant in Florida state court on November 18, 2003, alleging that Defendant breached the Storage Agreement by failing to store its products exclusively in Plaintiff's warehouse or by failing to store at least 10,000 to 20,000 pallets as provided in the September 12, 2002, letter. (Doc. No. 2, filed Dec. 23, 2003). In its complaint, Plaintiff seeks relief under the alternate theories of breach of contract and promissory estoppel. (*Id.*). Defendant removed the case to this Court based on its diversity jurisdiction under 28 U.S.C. § 1332. (Doc. No. 1, filed Dec. 23, 2003). Defendant then responded with its own counterclaim, alleging that Plaintiff breached the Storage Agreement by demanding by telephone that Defendant remove its products from Plaintiff's warehouse within two (2) days. (Doc. No. 21, filed Oct. 21, 2004). Both parties now move for summary judgment in their favor on the issue of Defendant's liability on Plaintiff's claims, and Defendant further moves for summary judgment on the question of Plaintiff's liability on the counterclaim. (Doc. No. 26; Doc. No. 31).

## Standard of Review

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.* The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied the burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then a court must not grant summary judgment. *Id.* (citation omitted).

## Discussion

### I.  Plaintiff's Breach of Contract Claim

The interpretation of the language of a contract is a matter of law to be decided by the Court. *Strama v. Union Fid. Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla. 1st DCA 2001). Florida law requires the Court to "give effect to the plain language of contracts when that language is

clear and unambiguous." *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1246 (11th Cir. 2002).

The law generally presumes that parties who execute a written instrument on the subject of their agreement intend that writing "to be the sole expositor of their agreement." *King v. Bray*, 867 So.2d 1224, 1226 (Fla. 5th DCA 2004). Thus the parol evidence rule provides that "[e]vidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract. This rule applies when the parties intend that a written contract incorporate their final and complete agreement." *Ungerleider v. Gordon*, 214 F.3d 1279, 1282 (11th Cir. 2000) (quoting *Johnson Enters. of Jacksonville v. FPL Group*, 162 F.3d 1290, 1309 (11th Cir. 1998)). Parol evidence is admissible for the purpose of clarifying or explaining contracting parties' intent in assigning meaning to an ambiguous term. *Hashwani v. Barbar*, 822 F.2d 1038, 1040 (11th Cir. 1987). Moreover, "parol evidence is not necessarily barred if the written agreement is incomplete, as long as the parol evidence does not contradict the written agreement." *Ungerleider*, 214 F.3d at 1284. In addition, parol evidence may be considered to prove "that there exists a contemporaneous independent agreement amounting to a separate transaction" as long as the terms of the written instrument are not contradicted. *Id.* (quoting *Schwartz v. Zaconick*, 68 So.2d 173, 175 (Fla. 1953).

In the instant case, Plaintiff does not assert that it entered into a separate oral contract with any of Defendant's employees.[7] (Doc. No. 40, p. 14). Instead, Plaintiff contends that "the

_____

[7] In response to Defendant's argument that any "verbal contract" asserted by Plaintiff must be barred by the Statute of Frauds (Doc. No. 26, pp. 8–10), Plaintiff responds that "SDE does not claim that it has any verbal contracts with AMCOR." (Doc. No. 40, p. 14).

Storage Agreement is not a fully integrated contract" and offers parol evidence of oral

representations and the September 12, 2002, letter "to explain the meaning of...the Storage

Agreement."  (*Id.* at 14 & n.2).

> **A.    Are the September 12, 2002, letter and the Storage Agreement
>         part of the same transaction?**

Plaintiff argues that the Storage Agreement must be read together with the September 12

letter drafted by Sanchez and signed by Ariazi, which letter Plaintiff believes was a part of the

same transaction and sheds light on the intent of the parties that Defendant would store

approximately 10,000 to 20,000 pallets, or all products sent out for public storage, in Plaintiff's

warehouse.  (*Id.* at 11).  Florida law does in fact permit courts to construe separate written

instruments together as a single contract under certain circumstances.  "[W]here two or more

documents are executed by the same parties, at or near the same time and concerning the same

transaction or subject matter, the documents are generally construed together as a single

contract."  *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 648 (11th Cir. 1992);

*see also Int'l Ship Repair & Marine Servs., Inc. v. Gen. Portland, Inc.*, 469 So.2d 817, 818 (Fla.

2d DCA 1985).

As Defendant correctly points out, the cases cited by Plaintiff in support of its position

are factually distinguishable from the instant case.  Several of Plaintiff's cases involve written

agreements in which the parties indicated their clear intent that separate documents were part of

the same transaction.  *See, e.g.*, *id.* at 649 (reading separate motel license and restaurant lease

together where agreements were executed on the same day, dealt with operation of related

businesses situated contiguously on same land, and each document contained express provision

that it was entered into in contemplation of the other); *Earman Oil Co. v. Burroughs Corp.*, 625

F.2d 1291, 1296–97 (5th Cir. 1980) (contract expressly provided for liability for all prior warranties, agreements and representations between parties, which included separate written document); *Computer Sales Int'l, Inc. v. Florida Dept. of Revenue*, 656 So.2d 1382, 1383, 1384 (Fla. 1st DCA 1995) (master lease agreement expressly referred to and sufficiently described second document, certificate of acceptance, which operated to set commencement date of lease); *cf. Williams v. Atlantic Sugar Ass'n*, 773 So.2d 1176, 1178 (Fla. 4th DCA 2001) (in case involving alien workers certified for employment in United States, initial "job offer" to domestic workers as required by law was read together with aliens' subsequent individual work contracts where federal law mandated that material terms and conditions of employment not vary from initial offer).

Additional cases cited by Plaintiff permit the reading of separate documents as a single transaction where such documents are executed simultaneously or in response to one another. *See, e.g.*, *Brown v. Fin. Serv. Corp.*, 489 F.2d 144, 149–50 (5th Cir. 1974) (cover letter accompanying purchase agreement and clearly stating its purpose to summarize in writing content of telephonic conversation concerning agreement was part of contract); *J. M. Montgomery Roofing Co. v. Howland*, 98 So.2d 484, 486 (Fla. 1957) (two separate instruments executed "almost simultaneously" by the same contractor with two different subcontractors were construed together and found to create an ambiguity as to term of one of the documents); *Cushman v. Smith*, 528 So.2d 962, 965 (Fla. 1st DCA 1988) (reading draft real estate sale contract signed by one party with "virtually identical" redraft prepared and signed by second party in response where parties subsequently proceeded under terms of that contract).

The Court may consider parol evidence to determine whether the September 12 letter and the Storage Agreement were part of the same transaction between the parties. *See, e.g.*, *Navy Mut. Aid Ass'n v. Barrs*, 732 So.2d 345, 347 (Fla. 1st DCA 1999); *Northwestern Bank v. Cortner*, 275 So.2d 317, 319 (Fla. 2d DCA 1973). In doing so, the Court is persuaded by several facts that the two documents should not be construed together as the full embodiment of the parties' agreement.

At the outset, the letter was drafted by Sanchez and signed by Ariazi *five months* before the execution of the Storage Agreement, distinguishing this case from every other case cited where separate instruments were signed on the same day or within a few days or weeks of one another. Additionally, unlike most of the cited cases, the Storage Agreement makes no explicit reference to any other document. To the extent that Plaintiff argues that the September 12, 2002, letter was incorporated based on language contained in the Storage Agreement which stated that "[Defendant] has provided [Plaintiff] with all material information regarding the specifications of such goods including information regarding the care and handling of said goods" (Doc. No. 26, Ex. 1; Doc. No. 31, p. 3), such reliance is unavailing. In order to effectively incorporate a document by reference, "there must be some expression in the incorporating document...of an intention to be bound by the collateral document.... A mere reference to another document is not sufficient to incorporate that other document into a contract...." *Temple Emanu-El of Greater Ft. Lauderdale v. Tremarco Indus., Inc.*, 705 So.2d 983, 984 (Fla. 4th DCA 1998) (quoting *Kantner v. Boutin*, 624 So.2d 779, 781 (Fla. 4th DCA 1993)) (alterations in original). In the instant case, there is no reference in the Storage Agreement to the September 12 letter at all, much less an expression of the parties' intent to be bound by the earlier writing. Moreover, it is undisputed

that Diaz and Frost, who signed the Storage Agreement on behalf of Defendant, had no

knowledge of the existence of the September 12 letter.  (Doc. No. 27, Sanchez Depo., pp. 138,

140).  Therefore, the two documents may not be considered together based on the doctrine of

incorporation.

 Finally, on its face, the September 12 letter is nothing more than a letter of intent or an

agreement to agree.  A letter of intent is defined as "[a] written statement detailing the

preliminary understanding of parties who plan to enter into a contract or some other agreement; a

*noncommittal* writing preliminary to a contract."  *Black's Law Dictionary* 916 (7th ed. 1999)

(emphasis added); *see also Midtown Realty, Inc. v. Hussain*, 712 So.2d 1249, 1252 (Fla. 3d DCA

1998).  The letter at issue included language concerning "estimates" and designates itself as "an

initial intent of business between [Defendant] and [Plaintiff]...."[8]  (Doc. No. 26, Ex. 2).  Both

Sanchez and Ariazi testified that they did not intend the letter to represent the final binding

agreement between the parties but instead signed the document for presentation to any potential

landlord in Plaintiff's efforts to locate and lease a warehouse.  (Doc. No. 27, Sanchez Depo., pp.

107–08, 111–12, 114–15, 117; Ariazi Depo., pp. 27, 32).  Therefore, the essential goal of the

letter was not to enter into a contractual relationship regarding the provision of warehousing

services; the purpose of the document was to assist Sanchez in securing a suitable facility to

lease.

 Furthermore, whether there is a mutual assent to be bound may be determined by factors

such as "the type of contract at issue, the number of terms agreed upon relative to all of the terms

---

[8]  Although the letter names Sanchez D. Express, Inc. rather than SDE Logistics, Inc., for
the purposes of this Order the Court assumes *arguendo* that those two entities are in privity.

to be included, [and] the number of details yet to be ironed out...."  *Midtown Realty*, 712 So.2d at

1252.  It is clear in the instant case that essential terms of the agreement between Plaintiff and

Defendant had yet to be negotiated, the most significant of which was the pricing structure for

storage and handling of Defendant's various products.  As compared to the specific rate

breakdown contained in the final Storage Agreement in which different prices were given based

on whether the pallets stored contained completed bottles or preforms and in which monthly

storage rates were distinguished from charges for moving pallets in and out of the warehouse

(Doc. No. 26, Ex. 1), the flat rate of $8.50 per pallet per month included in the September 12

letter was a vague, unnegotiated estimate of what Sanchez thought at the time of drafting he

would get under a final contract.  (Doc. No. 26, Ex. 2; Doc. No. 27, Sanchez Depo., pp. 119–20).

That the eventual Storage Agreement executed by the parties consisted of six (6) full, single-

spaced pages further indicates that when the one-page letter was signed by Ariazi and Sanchez,

many important terms and details remained to be determined.  Accordingly, the September 12

letter constitutes merely an intention to agree between Plaintiff and Defendant,[9] and that

document is neither binding on its own nor appropriately read together with the final Storage

Agreement as a part of the same transaction.

**B.      Is the Storage Agreement a fully integrated contract?**

Having determined that the September 12, 2002, letter is not to be construed together

with the February 12, 2003, Storage Agreement, the Court now turns to the Storage Agreement,

--------

[9] Based on the Court's finding that the September 12 letter is nothing more than a letter
of intent, the Court does not reach the issue of whether Ariazi had actual or apparent authority to
enter into a binding agreement for warehousing services on behalf of Defendant.

which Defendant does not dispute is a valid and binding contract.  Plaintiff contends that the

contract is not fully integrated and that parol evidence is admissible to demonstrate that the

parties intended to enter into an output/requirements agreement pursuant to which Defendant

would move all of its products for public storage into Plaintiff's warehouse.  (Doc. No. 40, p.

14).  As the Supreme Court of Florida has stated,

> when competent parties reduce their engagements to writing in terms that create a legal
> obligation..., it is conclusively presumed that the whole engagement and the extent and
> manner of their undertaking is contained in the writing.  The writing itself is the evidence
> of what they meant or intended by signing it.

*Gendzier v. Bielecki*, 97 So.2d 604, 608 (Fla. 1957).  Furthermore, courts have not required the

inclusion of an integration or merger clause in a written contract before finding such instrument

to be the full integration of an agreement between parties.  *See, e.g.*, *Bank of Coral Gables v.*

*Murphy*, 533 So.2d 902, 904 (Fla. 3d DCA 1988); *Integon Life Ins. Corp. v. Zammito*, 506 So.2d

48, 49 (Fla. 2d DCA 1987); *see also Johnson Enters.*, 162 F.3d at 1309 (a merger clause is one

way to prove integration); *Moore v. Penn. Castle Energy Corp.*, 89 F.3d 791, 797 n.3 (11th Cir.

1996) (quoting *Envtl. Sys., Inc. v. Rexham Corp.*, 624 So.2d 1379, 1383 (Ala. 1993)) ("Basically,

an integration clause 'is a portion of a particular contract that restates the rationale of the parol

evidence rule within the terms of the contract.'").

Whether a written contract between parties represents the full embodiment of their

agreement is a question to be answered in light of the writing itself "as well as the circumstances

surrounding its execution."  *Brown*, 489 F.2d at 149.  Parol and extrinsic evidence may be

considered in making this determination.  *See id.*; *Moore*, 89 F.3d 791, 797.  In *Moore*, the

Eleventh Circuit considered a written agreement between a landowner and the lessee of

subsurface mineral rights to the same land when a dispute arose concerning the number and

location of methane gas wells the lessee was permitted to drill under the contract.  89 F.3d at

793–94.  The plaintiff landowner claimed that the lessee's predecessor-in-interest had made an

oral promise not to drill in a particular area and not to drill more than six wells; however, the

written instrument contained no such restrictions, nor did it include an integration clause.  *Id.*

The Court pointed out that the writing was a formal document, as distinguished from an

"informal memorandum not purporting to be complete," and that the landowner had studied the

document and made changes before agreeing to sign it.  *Id.* at 797–98.  Finding that these facts

indicated that the plaintiff "recognized the importance of the written document...[and] that she

had the opportunity to require [the promisor] to put its alleged oral promise in writing," the

Court held that the written contract was a full integration of the parties' agreement and that parol

evidence was not admissible to prove the existence of the oral promise.  *Id.* at 798.  Finally,

although the contract liquidated the amount of damages for which the lessee would be liable to

the landowner for the construction and operation of six wells, the Court found that the contract

contained no provision by which the lessee's common law rights to drill additional wells were

waived.  *Id.*  The Court held that the parties reasonably would have been expected to include in

their final contract any promise not to exceed six wells, and therefore, such promise was not

collateral to the written agreement such that extrinsic evidence could be considered for its proof.

*Id.*

In the instant case, the evidence is undisputed that it was always the intention of both

parties to prepare a final, formal contract to memorialize their agreement.  (Doc. No. 27, Sanchez

Depo., pp. 114–15, 117).  Sanchez himself submitted a draft agreement to Diaz and Frost which

he prepared with the assistance of an attorney, and he testified that he informed his attorney of

Defendant's alleged promise that it would store all of its goods in his warehouse.  (*Id.* at 124,

127).  Upon meeting with Diaz and Frost on February 11, 2003, Sanchez had the opportunity to

discuss the revisions to the terms of the contract suggested by Diaz, and he took the marked-up

document to his attorney once again to incorporate some but not all of the changes they had

discussed.  (Doc. No. 76, Sanchez Depo., pp. 145–48, 150).  Additionally, Sanchez was advised

by Diaz and Frost that they were not going to include a minimum requirements provision in the

contract.[10]  (*Id.* at 161).  In light of these facts, the Court finds that any agreement relating to the

minimum quantities of Defendant's products to be stored in Plaintiff's facility or providing that

*all* of Defendant's public storage needs would be serviced by Plaintiff is not collateral in nature

but should be reasonably expected to be included in the formal, written contract executed by the

parties.  Therefore, the Court finds that the Storage Agreement is a fully integrated contract.

### C.        Are the terms of the Storage Agreement ambiguous?

Ambiguity arises when a term is capable of more than one reasonable definition; in

evaluating whether a particular undefined contractual term is ambiguous, courts look to what

such term is "ordinarily understood to mean by the average lay person."  *Estate of Miller v.*

*Principal Mut. Life Ins.* Co., 791 F. Supp. 858, 860 (M.D. Fla. 1992).  The Court will not employ

"strained and twisted reasoning" to insert an ambiguity into a contract where no such ambiguity

---

[10]  Plaintiff argues that Diaz and Frost indicated to Sanchez that they did not want to
include such a term because the contract would have to go back to Defendant's corporate office
for approval.  (Doc. No. 40, p. 15).  Even if this was so, such information was sufficient to put
Sanchez on notice that Diaz and Frost did not have the proper authority to make such a
commitment on behalf of Defendant.

exists in order to make a contract more favorable to a party than the one it signed.  *Smith v. Horace Mann Ins. Co.*, 713 F.2d 674, 676 (11th Cir. 1983); *Hashwani*, 822 F.2d at 1040. "The making of a contract depends...not on the parties having meant the same thing but on their having said the same thing." *Gendzier*, 97 So.2d at 608 (quoting Holmes, J., *The Path of the Law*, 10 HARV. L. REV. 457).

The Storage Agreement in the instant case opens with the statement that Defendant "has certain goods which need to be warehoused...."  (Doc. No. 26, Ex. 1, p. 1).  In support of its contention that the agreement was intended by the parties to be an output/requirements contract, Plaintiff urges the Court to consider parol evidence in its reading of the document's language referring to consignment of "[t]he Merchandise" and to the statement that "[a]ll goods for storage shall be delivered at the warehouse properly marked and packaged for handling."  (*Id.* at 2).

Turning first to the "all goods for storage" phrase, the Court finds no ambiguity in this clause.  It is clear that "for storage" modifies "all goods," thus applying the provision that follows to any of those goods which become designated by Defendant for storage in Plaintiff's facility.  The Court finds no support in Plaintiff's position that "all goods for storage" indicates the parties' intent to refer to all of the goods that Defendant produces.[11]

---

[11]  The provision contained in the Storage Agreement is distinguishable from a provision that could have been inserted in the document which begins, "All goods produced by Depositor shall be delivered for storage at the warehouse...."

With regard to the phrase "the Merchandise," Plaintiff points to Diaz's testimony concerning this term[12] in order to create the appearance of a latent ambiguity, for which parole evidence is admissible.  *See Hashwani*, 822 F.2d at 1040.  However, in the same deposition, Diaz described the Storage Agreement as one that was intended to be performed on a "per-pallet...pay-as-you-go basis," and stated that he "did not expect [Plaintiff] to store all of our pallets."  (Doc. No. 33, Diaz Depo., pp. 9, 36).  This characterization of the contract appears to clarify Diaz's testimony regarding "the merchandise" to mean that he understood that the term referred to all *types* of Defendant's products, not the full *quantity* of Defendant's products. Plaintiff's reading of Diaz's testimony does not create a true ambiguity in the terms of the Storage Agreement.

The Court finds that Defendant had no obligation under the Storage Agreement to store a specific quantity of pallets of bottles and preforms in Plaintiff's warehouse or, alternatively, to store in Plaintiff's facility all of the bottles and preforms it produced and elected to send out for public storage.  Therefore, the Court finds that Defendant did not breach the express terms of its contract with Plaintiff.

---

[12]  Diaz testified as follows:
> Q. ...I'm just trying to find out what the word "the merchandise" means.  Do you have an understanding?
> A.  Yeah, the merchandise, our bottles and preforms.
> Q.  Okay.  All of them?
> > MR. SCHIRTZER:  Object to the form.
> > THE WITNESS:  Yeah.

(Doc. No. 33, Diaz Depo., p. 21–22).

**D.      Did Defendant breach its duty of good faith and fair dealing?**

Plaintiff argues that even if the Storage Agreement allowed Defendant to exercise its

discretion in sending goods to Plaintiff's warehouse for storage, it violated the implied covenant

of good faith and fair dealing by failing to meet Plaintiff's reasonable commercial expectations.

(Doc. No. 40, pp. 15–19).

The duty of good faith and fair dealing is a part of every contract under Florida law.  *See*

*Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla. 1st DCA 1999).  This duty of good

faith cannot be construed to vary the express terms of an agreement, however, and courts have

held that the requirement "confers limited rights....'[T]he covenant' is not an independent

contract term."  *Burger King Corp. v. C. R. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999); *see*

*also Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So.2d 1232, 1235 (Fla. 4th

DCA 2001) ("The duty of good faith does not attach until the [p]laintiff can establish a term of

the contract that [the defendant] was obligated to perform."); *Sepe v. City of Safety Harbor*, 761

So.2d 1182, 1185 (Fla. 2d DCA 2000) (where contractual obligation to "vigorously pursue"

actions afforded defendant sole discretion to act, duty of good faith not violated where

reasonable party in the same position would have made same decision); *Hosp. Corp. of Am. v.*

*Florida Med. Ctr., Inc.*, 710 So.2d 573, 575 (Fla. 4th DCA 1998) (duty of good faith "not an

abstract and independent term of a contract which may be asserted as a source of breach when all

other terms have been performed").

Plaintiff relies on the *Cox* decision to support its claim.  In *Cox*, the plaintiff truck drivers

entered into separate but identical contracts to haul freight for the defendant.  732 So.2d at 1094.

The terms of the contracts gave the defendant discretion in deciding which hauls to assign to the

plaintiffs and contained no guidance as to how such discretion was to be exercised.  *Id.*  When

the plaintiffs alleged that the defendant had breached the duty of good faith by assigning to them

only the shorter-distance, lower-paying jobs, the court held that summary judgment for the

defendant was improper.  *Id.* at 1098.  The Court agrees with Defendant that *Cox* is

distinguishable from the instant case on one very significant point: the plaintiffs in *Cox* were

obligated under their contracts to work *exclusively* for the defendant, and the record in that case

reflected that a truck driver working only for the defendant "would be unable to meet the costs of

operation" based on the types of loads the plaintiffs were being assigned.  *Id.* at 1094, 1098.

Having found in the instant case that Defendant did not breach the terms of the Storage

Agreement and in light of the fact that Plaintiff was not prevented under the contract from

providing warehousing services to other customers, the Court finds that Plaintiff cannot prove its

claim that Defendant breached a duty of good faith and fair dealing.  Accordingly, the Court will

grant Defendant's motion for summary judgment on Plaintiff's breach of contract claim and

deny as moot Plaintiff's motion for summary judgment on the same claim.

## II.  *Plaintiff's Promissory Estoppel Claim*

In order to maintain a claim for promissory estoppel under Florida law, Plaintiff must

satisfy the following elements by clear and convincing evidence: "(a) a promise was made by

Defendant which Defendant reasonably expected Plaintiff to act upon, (b) that Plaintiff in fact

acted upon it, and (c) that injustice can only be avoided by enforcing such a promise."  *See*

*Argonaut Dev. Group, Inc. v. SWH Funding Corp.*, 150 F. Supp. 2d 1357, 1364 (S.D. Fla. 2001).

"The promisor is affected only by reliance which he does or should foresee" and such foresight

may depend on the promise's "definite and substantial character."  *W.R. Grace and Co. v.*

*Geodata Servs., Inc.*, 547 So.2d 919, 924 (Fla. 1989) (quoting *Restatement (Second) of Contracts* § 90 (1979)).

"[A] truthful statement as to the present intention of a party with regard to his future act is not the foundation upon which an estoppel may be built." *Id.* (quoting *South Inv. Corp. v. Norton*, 57 So.2d 1, 3 (Fla. 1952)). In *Grace*, the plaintiff alleged that after the parties had entered into a contract for the digging of mineral wells, the defendant made the plaintiff three separate promises of additional business, including a statement that the plaintiff would get work extending as far out as fifteen to twenty-five years. *Id.* at 925. The Court held that only one of the promises made by defendant contained any possible inducement, causing plaintiff to buy additional equipment on the promise that the defendant would give the plaintiff additional work; however, after the plaintiff procured the equipment, it did in fact receive extra work from the defendant. *Id.* Therefore, no promise was broken. *Id.* The Court found that subsequent promises made by the defendant were too uncertain and did not induce the plaintiff to take any action, and it denied the plaintiff's claim of promissory estoppel. *Id.*

In contrast, the alleged promises made to Sanchez in the instant case by Frost, Diaz and Ariazi occurred at a time when they knew that Sanchez was not engaged in the warehousing business and did not have a lease on a warehouse. (Doc. No. 27, Sanchez Depo., pp. 93–94). Although the Court has determined *supra* that the September 12, 2002, letter was nothing more than a letter of intent, Sanchez testified that Diaz and Frost, in addition to Ariazi before his termination, made several oral promises that Plaintiff would receive all of Defendant's goods for public storage if he could acquire an adequate facility. (*Id.* at 117; Doc. No. 76, Sanchez Depo., pp. 152, 156). There is evidence in the record that Frost and Diaz were aware that Sanchez was

looking for a facility, that Frost had even seen the brochures for two buildings in the summer of 2002 (Doc. No. 27, Sanchez Depo., pp. 100, 137), and that Sanchez was told "not to worry" before entering into the lease agreement because "they were going to sign the contract."  (Doc. No. 76, Sanchez Depo., p. 152).  Sanchez further testified that he would not have entered into a lease agreement for a warehouse or signed the Storage Agreement without these assurances.  (*Id.* at 156; Doc. No. 32, Sanchez Aff., ¶ 4).  Such evidence creates genuine questions of fact as to whether Defendant reasonably expected Plaintiff to act on its representations and whether the alleged promises were definite and substantial in nature.  *See Swerhun v. Gen. Motors Corp.*, 812 F. Supp. 1218, 1222 (M.D. Fla. 1993) (denying summary judgment on promissory estoppel claim).

The Court agrees with Defendant to the extent that promissory estoppel is an equitable doctrine and, therefore, damages should be limited to those which Plaintiff sustained as a direct result of any justifiable reliance upon the alleged promises prior to the time Plaintiff entered the Storage Agreement.  *See Baxter's Asphalt & Concrete, Inc. v. Liberty County*, 406 So.2d 461, 467 (Fla. 1st DCA 1981), *quashed on other grounds by* 421 So.2d 505 (Fla. 1982).  Accordingly, Plaintiff may not seek damages of lost profits based on the anticipated three-year term of the Storage Agreement.   However, the Court will deny Defendant's motion for summary judgment on Plaintiff's promissory estoppel claim.

## III.  *Defendant's Breach of Contract Counterclaim*

Defendant's counterclaim alleges that Plaintiff's June 4, 2003, demand by telephone that all goods be removed from Plaintiff's warehouse within two (2) days constituted a breach of the Storage Agreement.  (Doc. No. 21).  The Storage Agreement provided that Plaintiff "may, upon

*written notice* to [Defendant]..., require the removal of any goods by the *end of the next succeeding month*." (Doc. No. 26, Ex. 1) (emphasis added). Diaz averred that, as a result of Plaintiff's breach, Defendant incurred additional storage and shuttling costs during the month of June 2003. (Doc. No. 27, Diaz Aff., ¶ 14).

Plaintiff did not address this issue in its response to Defendant's motion for summary judgment. (Doc. No. 40). Plaintiff's affirmative defenses to the counterclaim include its contention that Defendant had already breached the Storage Agreement and that Plaintiff took this action in order to mitigate its damages. (Doc. No. 23, filed Nov. 9, 2004, pp. 3, 4). However, the Court has already determined that Defendant had not breached the contract at the time Plaintiff demanded that the goods be removed. Furthermore, there appear to be no factual disputes in the record concerning the method by which Sanchez notified Defendant of its decision or the timeframe in which Defendant was expected to comply, both of which violate the express terms of the agreement. Accordingly, Defendant's motion for summary judgment will be granted as to liability on its counterclaim for breach of contract.[13] The case will proceed to trial on the issue of damages.

---

[13] Defendant bears the burden to prove by competent evidence its damages on its counterclaim. Diaz averred that Defendant "incurred additional storage charges of $24,869.54 in the month of June, 2003 for the product it was required to remove from SDE's facility and store at a replacement warehouse...." (Doc. No. 27, Diaz Aff., ¶ 14). There is no evidence brought to the attention of the Court that this amount was paid by Defendant. This statement by Diaz is not refuted by Plaintiff. However, in the absence of an invoice or other documentation explaining the charges and proof that Defendant in fact paid the additional storage fees, Diaz's statement is not the sort of evidence on which the Court can rely with confidence in granting a judgment on damages.

**Conclusion**

Based on the foregoing, the Court rules as follows:

1.  Defendant's Motion for Final Summary Judgment (Doc. No. 26) is **GRANTED** as to Count I of Plaintiff's complaint (Breach of Contract) and as to Plaintiff's liability on Defendant's counterclaim (Breach of Contract) and **DENIED** as to Count II of Plaintiff's complaint (Promissory Estoppel).

2.  Plaintiff's Motion for Partial Summary Judgment (Doc. No. 31) is **DENIED** as moot. The case will proceed to trial as scheduled.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this _22nd___ day of April, 2005.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record